## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MARILYN E. COX,

      Plaintiff,

vs.                                                                       No. CIV 12-899 LFG

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff Marilyn E. Cox's ("Cox") Motion to
Reverse or Remand, filed January 7, 2013. [Doc. 24.]  The Commissioner of Social Security issued
a final decision denying benefits, finding that Cox was not entitled to disability insurance benefits
("DIB").  The Commissioner filed a response to Cox's motion [Doc. 25].  Cox did not file a reply,
but the matter is ready for resolution. [Doc. 26.]  Having considered the pleadings submitted by the
parties, the administrative record and the applicable law, the Court grants the motion to remand for
the reasons described below.

## I.      PROCEDURAL BACKGROUND

On about October 8, 2008, Cox applied for DIB [AR 17, 115],[1] alleging that she was disabled
as of December 12, 2007, due to coronary artery disease ("CAD"), peripheral artery disease
("PAD"), chronic obstructive pulmonary disease ("COPD"), asthma, anxiety, panic attacks,
depression, obstructive sleep apnea, and an autoimmune disorder. [AR 30.]  Cox's DIB application
was denied at the initial and reconsideration levels.  [AR 17, 58, 60.] On October 1, 2010, an ALJ

---

[1]The Court refers to pages in the Administrative Records by noting "AR" and the page number.

conducted the administrative law hearing in Orlando, Florida.[2] Cox was present at the hearing with a non-attorney representative. [AR 26-57.] On October 26, 2010, the ALJ issued a written decision denying Cox's DIB application. [AR 17-25.] On June 29, 2012, the Appeals Council reviewed the case along with Cox's attorney's letter and additional medical evidence. [AR 4.] The Appeals Council denied the request for review. [AR 1-4.]  On August 22, 2012,  Cox filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

Cox was born on March 25, 1957, and was 53 years old at the time of the ALJ hearing.  [AR 30, 32.] She has a high school education. [AR 32.] Her past relevant work included administrative assistant, receptionist, medical assistant, office manager and bookkeeper. [AR 53.] Her earning records are sporadic and variable.  For example, from 1974 to 2000, there were years Cox did not have any earnings, and in some years she earned as little as $1422.00; in other years, she earned up to $13,000.  [AR 125.] In 1997 and 1998, she earned between $13,000 and $14,000.  In 1999, Cox had no earnings.  She had little earnings in 2001-2004, but then in 2005, she earned over $14,000, and in 2007, her highest earnings were over $37,000.  In 2008, Cox earned over $21,000.  There were no subsequent earnings.

Cox is married and lives at home with her husband. [AR 32.] She has suffered tragedy in her life, having lost her son to suicide over 15 years ago.  In addition, her daughter was a drug addict and abandoned her young twin sons, whom Cox and her husband are raising. [AR 32, 29.] Cox also faced significant medical issues, including triple bypass surgery for heart-related disease, a

---

[2]It appears that Cox recently moved to New Mexico.  The majority of her medical records document medical treatment in Florida.  The administrative proceedings in relation to her DIB application occurred in Florida.

pulmonary embolism after the surgery, and a later stroke.  Cox has been a heavy, long-term smoker, who smoked even after heart surgery.[3]  (*See* discussion of medical records *infra*.)

## II.   <u>STANDARDS FOR DETERMINING DISABILITY</u>

In determining disability, the Commissioner applies a five-step sequential evaluation process.[4]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[5]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[6] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits her physical or mental ability to do basic work activities . . . .;"[7] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[8] and, at step four, the claimant bears the burden of proving she is incapable of meeting the

---

[3]At the ALJ hearing, Cox denied that she continued to smoke after heart surgery, but many medical records are to the contrary.

[4]20 C.F.R. § 404.1520(a)-(f) (1999); <u>Williams v. Bowen</u>, 844 F.2d 748, 750 (10th Cir. 1988).

[5]20 C.F.R. § 404.1520(a)-(f) (1999); <u>Sorenson v. Bowen</u>, 888 F.2d 706, 710 (10th Cir. 1989).

[6]20 C.F.R. § 404.1520(b) (1999).

[7]20 C.F.R. § 404.1520(c) (1999).

[8]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

physical and mental demands of her past relevant work.[9]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[10] age, education and past work experience, she is capable of performing other work.[11]

Here, the ALJ determined at step four that Cox could perform her past relevant work as a receptionist.  In so finding, the ALJ relied, in part, on testimony by a vocational expert.  [AR 25.]

## III.   STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  A decision is not based on substantial evidence "if it is overwhelmed by other evidence in the record."  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks omitted).

The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis

---

[9]20 C.F.R. § 404.1520(e) (1999).

[10]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[11]20 C.F.R. § 404.1520(f) (1999).

v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1214.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

## IV.    ALJ'S FINDINGS

In denying Cox's DIB application, the ALJ noted that Cox filed a DIB application on September 25, 2008, alleging a disability onset date of December 12, 2007.  Cox last met the insured status requirements of the Social Security Act ("SSA") on March 31, 2010. [AR 19; Doc. 24, at 3 n.2.][12] Thus, the question is whether substantial evidence in the record supports the Commissioner's

_____

[12]The parties dispute whether the date Cox was last insured was March 30 or 31, 2010.  It appears to make no difference.

final decision that Cox was not disabled from December 12, 2007, the onset date, through March 31, 2010, the date Cox's insured status expired. [AR 32-33; Doc. 25, at 1.]

The ALJ found that Cox did not engage in substantial gainful activity from the onset date of December 12, 2007 through the date she was last insured. [AR 10.] The ALJ determined that Cox had severe impairments of "status post catheterization, coronary artery disease, obstructive sleep apnea, asthma, COPD and tobacco abuse." [AR 19.] Cox did not have a medically determinable impairment or combination of impairments that met any listing. [AR 20.]

In analyzing Cox's severe impairments, the ALJ discussed Cox's allegations that she suffered from panic attacks attributed to stress. The ALJ noted that Cox stated the panic attacks began 15 years ago, prior to her son's suicide. Cox contended that the panic attacks caused agoraphobic behavior in which she refused to leave her home. Eventually, however, Cox overcame her fear, could leave her home, and was able to go to work. [AR 19.]

The ALJ further discussed Cox's daily activities, including her ability to independently care for her personal needs and care for 7 year-old twin grandsons, over whom she and her husband had custody. Cox cooked, drove, helped the children with their homework, read, and occasionally went fishing. She testified that her daytime fatigue was improved with treatment for her medical conditions.

The ALJ found no evidence in the record that Cox was unable to concentrate or focus on tasks.[13] The ALJ concluded that the medical evidence failed to establish that Cox met the severity level as described in listing 12.04 (affective disorders), and determined that Cox's alleged mental health limitations were "mild at most." Therefore, the ALJ did not find Cox's mental health

---

[13]While the ALJ discounted treating physicians' opinions, there is evidence from the treating physicians that Cox's ability to focus or concentrate was impaired or limited.

conditions to be severe.   However, the ALJ noted that the RFC adopted herein "more than fully accommodates any minimal limitations" Cox had because of such conditions. [AR 20.]

In further discussing possible listings based on severe impairments, the ALJ analyzed listing § 4.00 et seq. (cardiovascular systems) and § 3.00 (respiratory system).  Notwithstanding Cox's combined impairments, the ALJ decided that medical evidence did not document listing-level severity.  She further observed that no acceptable medical source mentioned findings equivalent in severity to the criteria of any listed impairment, either individually or in combination. [AR 20.]

After careful consideration of the entire record, the ALJ concluded that Cox had the RFC to perform sedentary work, "except she could sit, stand and walk for six hours in an eight hour workday." [AR 20.]  She could occasionally lift and carry 20 pounds, and frequently lift or carry 10 pounds.  She was to avoid moderate exposure to fumes, gases, dusts, poor ventilation, extreme heat and humidity.  Cox could perform simple to moderately detailed tasks, but could not perform highly complex tasks. [AR 20.] In reaching these findings, the ALJ provided a thorough analysis and discussion of Cox's testimony, the medical evidence, and opinion evidence. [AR 21-25.]

The ALJ concluded that Cox could perform past relevant work as a receptionist and that her RFC did not preclude the performance of those work-related activities. [AR 25.] She noted the DOT description of receptionist and a sedentary exertion with an SVP 4.[14]  The ALJ stated that she compared Cox's RFC with the physical and mental demands of the work, concluding that Cox could

---

[14]"The Dictionary of Occupational Titles, which is published by the U.S. Department of Labor and relied on by the Commissioner for vocational information, assigns an SVP to each job it lists. SVP is defined as 'the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" U.S. Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, App. B, B–1 (1993).  Dikeman v. Halter, 245 F.3d 1182, 1186 n.2 (10th Cir. 2001).  An SVP of 4 indicates that the position takes "[o]ver 3 months up to and including 6 months" to learn. Ehimika v. Colvin, 2013 WL 1811788, at *1 n.1 (10th Cir. May 1, 2013) (unpublished) (citation omitted).

perform the job as it was actually and generally performed. [AR 25.] The ALJ determined that Cox was not under a disability from the onset date to the date she was last insured.

## V.    MEDICAL HISTORY AND BACKGROUND

There are a number of medical records from as early as the late 1990s and early 2000s. These dated records have little bearing on the resolution of Cox's 2008 DIB application.  The Court briefly discusses them.

### *1990s - 2004 Medical Records*

Most of the very early records document treatment for Cox's allergies and sinusitis.  She was seeing medical care providers and physicians with Allergy Asthma Specialists ("AAS") in Florida who provided substantial labwork and allergy testing, along with pulmonary function testing.  Some of the records record Cox's smoking history of 30 years or 30 cigarettes per day.  None of these early records, to the extent they can be completely deciphered, advise Cox to stop smoking.   [AR 282-83, 285, 298, 354, 373-376, 767.] The exception is a letter from a physician with Allergy Asthma Specialists indicating that Cox was hoarse and sounded like a smoker and that it was important for her to stop smoking.  Cox was to get advice with help how to stop smoking and smoking cessation programs. [AR 451-52.]

In 2004, Cox continued to see AAS physicians and obtain allergy testing. [AR 286, 287, 343, 287.] One of the AAS physicians wrote to Cox's primary care doctor in late 2004, indicating that Cox suffered from chronic rhinitis, asthma, and COPD.   She had a history of immune deficiency/hypogammaglobulinemia.[15]  During the last three months, Cox had a few episodes of the

---

[15]"Hypogammaglobulinemia refers to a set of clinicolaboratory entities with varied causes and manifestations. The common clinical feature of hypogammaglobulinemia relates to a predisposition toward infections that normally are defended against by antibody responses (including Streptococcus pneumoniae and Haemophilus influenzae infections)."

"sniffles" and congestion but no "intracurrent illness." Her two grandsons, then 16 months old, had

been sick. Cox received IVIG[16] infusions for her hypogammaglobulinemia. The letter indicates Cox

had a history of smoking. [AR 443.]

### *2005 Medical Records*

On January 15, 2005, Cox was seen at a hospital in Florida. Tobacco abuse is one of her

diagnoses. She smoked a pack of cigarettes every day for thirty years. The medical provider

discussed smoking cessation with Cox and risk factor modifications. [AR 487-88.] She recently had

developed back/side pain that radiated through her chest.

Cox was seen extensively by AAS for allergy testing and lab work. She had problems with

GERD, asthma, and rhinitis. [AR 21-22.] Cox often complained of feelings of "clogged head," sinus

pressure, coughing, and mucous. [AR 441.] After testing in March 2005, it was felt that Cox either

had viral pneumonia or changes in her lungs due to smoking. [AR 385, 384; dup 774.] On April 26,

2005, her pulmonary function report indicated Cox smoked a pack a day for many years. She had

"borderline airway obstruction." [AF 366, 368; dup 765.]

---

http://emedicine.medscape.com/article/136471-overview (6/17/2013). "Common Variable
Immunodeficiency is one of the key causes of Hypogammaglobulinemia. It results in a decrease in the
level of IgM, IgA, and IgG kinds of immunoglobulins in the body system. It is a deficiency in the
immune system which is either inherited (congenital hypogammaglobulinemia) or acquired ( acquired
hypogammaglobulinemia)." http://www.hxbenefit.com/hypogammaglobulinemia.html (6/17/2013)

[16]"IVIG is given as a plasma protein replacement therapy (IgG) for immune deficient patients
who have decreased or abolished antibody production capabilities. In these immune deficient patients,
IVIG is administered to maintain adequate antibody levels to prevent infections and confers a passive
immunity. Treatment is given every 3–4 weeks. In the case of patients with autoimmune disease, IVIG is
administered at a high dose (generally 1-2 grams IVIG per kg body weight) to attempt to decrease the
severity of the autoimmune diseases such as dermatomyositis. Currently, IVIG is being increasingly used
off-label in a number of pathological conditions; the increasing world-wide usage of IVIG may lead to
shortages of this beneficial drug." http://en.wikipedia.org/wiki/Intravenous_immunoglobulin (6/17/13).

On September 22, 2005, an AAS physician wrote a letter to one of Cox's primary care doctors, discussing IVIG for her autoimmune condition.  Her last infusion was two years ago.  She complained that day of feeling tired and having a sore throat, stuffy nose, headaches, poor appetite, mucous, and a cough.  Cox was taking a number of medications, including inhalers.  The physician noted that she should make up her mind to quit smoking, and to pick a date and do it. [AR 436, 437.] A chest x-ray in November 2005 showed no significant change from the last x-ray.  There were changes possibly related either to bronchitis or tobacco use. [AR 383; dup 773.]

### *2006 Medical Records*

In 2006, Cox continued to see AAS.  Indeed, with the exception of later hospital records for surgery and catheterizations, a significant portion of records in the administrative record are from AAS, including lab work, pulmonary function tests, allergy testing checklists, and office notes. Some of the pulmonary function reports indicate moderate airway obstruction; some indicate severe airway obstruction. [AR 364; dup 763; AR 363; dup 762.]

A radiology report in May 2006, showed Cox's lungs were clear. [AR 382; dup 772.] A letter from Dr. Patel with AAS, addressed to whom it may concern, stated Cox had hypogammaglobulinemia and recurrent URI/sinusitis for the last few years.  She needed a trial of IVIG for the next six months based on her IG levels. [AR 390.] In June 2006, Cox was seen at AAS for a runny nose and mucous.  She complained of "fullness and popping" in her ears and coughing. She was a current smoker.  AAS suggested she see a local pulmonologist for a possible sleep study. The doctor also suggested Cox quit smoking and join a local smokers' cessation group. [AR 428, 429.]  She was prescribed antibiotics.

Cox was seen at AAS throughout 2006 with about the same complaints and test results. [AR 289, 290, 362, 589; dup 761.]

10

### *2007 Medical Records*

Cox again was seen regularly by AAS in 2007 for labwork and pulmonary function reports. She continued to smoke, and continued to complain of coughing, congestion and phlegm. [AR 361, 372, 586-88.] On June 6, 2007, Dr. Alidina with AAS wrote a letter to Cox's primary care doctor. Cox had an upper respiratory infection for the third time in three months. She was prescribed antibiotics. She complained of nasal congestion, chest tightness from asthma, extreme fatigue, headaches, and a fever. She had problems with insurance coverage in relation to the IG injections. She appeared tired but not in acute distress. The assessment was chronic rhinitis, common variable immune deficiency, bronchial asthma, upper respiratory infection, and nicotine addiction. [AR 417-18.]

On June 24, 2007, Cox was seen for right shoulder pain. The records indicate Cox smoked two packs a day for 20 years, but that she wanted to quit. She had diminished lung sounds. She was prescribed pain medications. [AR 585.]

On July 29, 2007, Cox complained of middle back pain. She was wheezing and had swelling around the eyes. She reported having fallen at work and had back pain. [AR 584.] An August 2007 pulmonary function report indicated severe or moderate airway obstruction. [AR 371.]

On August 27, 2007, Cox was seen for increased sneezing, sinus pain, fatigue, a sore throat, sinus pressure, tightness in the chest, and coughing. A handwritten note states smoking cessation was advised. [AR 455, 457.] Cox continued to have similar problems with wheezing in November. [AR 582.]

On November 26, 2007, Cox's cardiologist, Dr. Kothari wrote to Dr. Dycus, the primary care physician. Dr. Kothari noted he was seeing Cox for the first time. She had retrosternal chest pain and hypertension for 10 years. She was a chronic smoker who smoked more than a pack a day for

the last 15 years.  Cox was taking Prozac (antidepressant), Nexium (for GERD), Cardizem (for high blood pressure, angina), Estratest (hormone replacement), Accolate (for asthma) and Lipitor (cholesterol lowering medication).  Cox's chest pain was atypical.  She was scheduled for a nuclear exercise stress test.  Dr. Kothari counseled Cox at length about the risk of cigarette smoking, including the development of atherosclerotic vascular disease leading to myocardial infarction and stroke.  He strongly encouraged Cox to quit smoking. [AR 533-34.] A chest x-ray indicated no congestive heart failure and no active disease. [AR 593.]] Other testing indicated a recommendation for cardiac catheterization.[17] [AR 539, 540.]

In December 2007, Dr. Kothari noted that Cox's hypertension was well controlled on Cardizem.  However, she was to undergo a cardiac catheterization related to chest pain and ischemia.[18]  A December 10, 2007 record indicated ongoing tobacco abuse, that Cox smoked approximately two packs a day, and that the cardiac catheterization was scheduled on December 11th. [AR 556.]

On December 11, 2007, the catheterization showed three vessel coronary artery disease involving 80% stenosis of the right coronary artery.  The other two arteries were compromised. Again, Cox's "extensive smoking history" was noted. [AR 463, 464.] No depression or psychiatric problems were indicated on this record. [AR 552.]

---

[17]"Cardiac catheterization is a medical procedure used to diagnose and treat some heart conditions.  A long, thin, flexible tube called a catheter is put into a blood vessel in your arm, groin (upper thigh), or neck and threaded to your heart. Through the catheter, your doctor can do diagnostic tests and treatments on your heart."  http://www.nhlbi.nih.gov/health/health-topics/topics/cath/ (6/17/13).

[18]Ischemia "is a restriction in blood supply to tissues, causing a shortage of oxygen and glucose needed for cellular metabolism (to keep tissue alive)."  http://en.wikipedia.org/wiki/Ischemia (6/17/13).

Dr. Kothari's December 11, 2007 record discusses Cox's risk factor in that she was a chronic smoker who he counseled at length about the risks of cigarette smoking. He encouraged her to quit. [AR 554.] Cox had triple bypass heart surgery.[19]  [AR 503.] On December 20, 2007, a medical record indicates Cox was taking Xanax (anti-anxiety) and Prozac. [AR 579.]  A December 23, 2007 record notes that Cox, a smoker, who recently had CAD and was "status post coronary artery bypass grafting with left internal mammary artery," awoke with a pain in the left tooth area and ear, and had numbness on the left side of the nose. [AR 550.] It was discovered that Cox developed a pulmonary embolism after surgery. [AR 578.] She was prescribed two blood thinners, Lovenox and Coumadin, and initially did fairly well until developing chest soreness again on the left side. She attributed it to muscle pain as she stated she had been doing more than she should have done. This record notes that Cox "continued to smoke even though she stated she was cut down." She decided to get over the "6 weeks postoperative and to start taking Chantix ('stop smoking medication') and start a smoking cessation plan at that time." [AR 507.] Cox was prescribed Percocet (pain medication), Xanax, Prozac and other medications.

December 12, 2007 is the onset date of disability Cox provided in her DIB application. [AR 17.]

### *2008 Medical and Disability Records*

In January 2008, Cox's chest x-ray indicated a stable chest. It also noted she was an ongoing smoker. [AR 492, 509.] Cox's check-up on January 14, 2008, with the surgeon who performed the triple bypass procedure, indicated she was healing well and her chest was clear. [AR 462.] On

---

[19]"Though it may sound like a completely different heart surgery, triple bypass heart surgery is a type of open heart bypass surgery only. It is called triple bypass because the number of grafts done in this procedure are three." http://indiasurgery.indicure.com/2012/03/triple-bypass-heart-surgery-important.html (6/17/13).

January 24, 2008, however, Cox awoke in the night with persistent chest pain and went to the hospital.  Darvocet did not relieve her pain. [AR 476.] An x-ray was normal.  Emphysematous changes[20] in the lungs bilaterally were noted. [AR 499.]

On January 31, 2008, Cox was seen by the cardiology practice for a skin rash and chest pain. The doctor noted she had a mild rash.  He believed her chest pain might be related to a superficial nerve injury.  He prescribed a statin medication for hyperlipidemia.[21]

Cox was seen by Dr. Kothari in February 2008, but the cardiologist's records are not easy to decipher. [AR 527.] Cox did not have angina on this date.

On February 13, 2008, Cox was seen by her primary care physician for nasal congestion, coughing, and tickling in her throat.  She was almost out of her pain medications.  She had acute bronchitis with bronchospasm and chest wall pain.  She was prescribed Lortab for severe pain and referred for pain management. She continued with these same problems on February 16, 2008, although she felt worse. [AR 575.]

Throughout the remainder of 2008, Cox was seen very frequently, sometimes within just days, by her primary care doctor, AAS, or at the hospital.

On February 25, 2008, she was seen by AAS.  She was having more infections and the IVIG was restarted.  She was noted as a smoker. [AR 391.] On March 18, 2008, she complained of

---

[20]"Emphysema is a long-term lung disease. In people with emphysema, the tissues necessary to support the shape and function of the lungs are destroyed. It is included in a group of diseases called chronic obstructive pulmonary disease or COPD. Emphysema is called an obstructive lung disease because the destruction of lung tissue around smaller sacs, called alveoli, makes these air sacs unable to hold their functional shape upon exhalation. Emphysema is most often caused by tobacco smoking and long-term exposure to air pollution."  https://en.wikipedia.org/wiki/Emphysema (6/17/13).

[21]"Hyperlipidemia is a heterogeneous group of disorders characterized by an excess of lipids in the bloodstream. These lipids include cholesterol, cholesterol esters, phospholipids, and triglycerides. Lipids are transported in the blood as large 'lipoproteins'."
https://www.clinicalkey.com/topics/cardiology/hyperlipidemia.html (6/17/13).

diarrhea. [AR 574.] On March 24, 2008, she complained of ongoing coughing and congestion. [AR 573.] On April 7, 2008, the cardiologist noted Cox did not have chest pain. [AR 643.] On May 3, 2008 to June 10, 2008, Cox was wearing a heart monitor.  She complained on various days of chest pain, burning or stabbing in the chest, different beats and dizziness. [AR 653.] On May 13, 2008, she complained of palpitations and sweating.  She may have been trying to stop smoking at this time but the record is unclear. [AR 525; dup 642.]

On May 15, 2008, she had a stress test indicating mostly normal functions. [AR 535; dup 644.] On May 16, 2008, Dr. Kothari's notes may say something about nicotine withdrawal. [AR 524; dup 641.] On May 27, 2008, Cox complained to the primary care provider that she had pain in the right leg and hip area.  She was prescribed Voltarin. [AR 572.]

On May 29, 2008, Cox went to the hospital.  She awakened with stabbing left-sided chest pain that was not relieved by Percocet.  The notes indicate Cox was a smoker.  They gave her Morphine and Nitroglycerine. [AR 466, 470.]

On May 29, 2008, there is a patient medical transcriptions report related to her hospital visit. The impression was atypical chest pain, a history of CAD, status post coronary artery bypass grafting, hypertension, positive tobacco use, dyslipidemia, postoperative pulmonary embolism.  The recent May stress test was negative for ischemia.  She presented to the emergency room with complaints of chest pain.  The note specifically states that Cox "does continue to smoke." [AR 656.] The chest x-ray was normal.

On June 9, 2008, Cox was seen by her primary care doctor for coughing, congestion, and ear discomfort.  She had bronchitis. [AR 571; dup 612.] She also was seen on July 1, 2008 by her cardiologist. [AR 523; dup 640.] She did not have chest pain.  On July 29, 2008, she was seen by

her primary care doctor for coughing, sneezing, chills, headache, and fatigue. [AR 570; dup 611.] On August 14, 2008, Cox complained of hip and lower back pain. [AR 569; dup 610.]

On September 25, 2008, Cox filled out her DIB application. [AR 17, 115.] An October 8, 2008 social security note states Cox returned to the same job at the same pay and hours after her triple bypass surgery on December 12, 2007, but that she took 8 weeks off after surgery. She returned to work in mid-February 2008 and continued to work until mid-July 2008 when she stopped work because of stress-caused anxiety. According to Cox, the doctor told her she should take a break. [AR 159.]

On October 10, 2008, Cox was seen again by AAS for testing and pulmonary function reports. [AR 288, 345, 370, 565; dups 564, 786.] These records indicate Cox was still smoking. [AR 370 ("25 cigs" "severe airway obstruction").] Cox saw Dr. Kothari, her cardiologist, on October 17, 2008. She did not have chest pain but had more stress in her life. [AR 522; dup? 539.]

On October 23, 2008, Cox saw Dr. Dycus, her primary care doctor. She complained of wheezing, feeling "achy," running nose, sneezing, phlegm, and coughing fits. She had acute bronchitis with a cough. [AR 567; dup 608.] Four days later, Cox was seen again for congestion, coughing, mucous, wheezing and fatigue. The note indicates "persistent bronchitis vs. pneumonia bronchospasm." The doctor also wrote "counseled on smoking." [AR 566; dup 607.]

On October 28, 2008, Cox filled out an adult report for disability services. She reported she had triple bypass surgery in December 2007, and alleged she could not lift much and was extremely tired due to hypogammaglobulinemia. She stated she started falling asleep at her desk every day after lunch. Cox also suffered from a panic disorder and severe depression. [AR 167, 178.] Cox listed her prior jobs, the doctors she was seeing, and her medications, noting few side effects. [AR 169, 170, 171, 175, 179.] She stated it was impossible to commit to keeping a job with her panic

16

disorder.  The panic attacks began in 1992 and were so bad she had to resign.  She had at least 50 panic attacks a day. [AR 190.]

On November 6, 2008, she filled out a supplemental cardiac questionnaire.  She noted she had several EKGs since December 2007.  She suffered from chest discomfort. [AR 192-195.] On this same date, Cox filled out a supplemental anxiety questionnaire.  Her anxiety or panic began in 1983-84, and the most recent panic attack occurred the day before.  She claimed to have 140-150 panic attacks in the last six months that lasted from 5 to 30 minutes.  Stress and feeling upset caused the attacks.  It helped being home and taking medications.  The attacks came on without warning; when she had panic attacks, she could not breathe or think, and could not keep a job with set hours. [AR 197-98.]

On November 6, 2008, Cox also filled out an adult function report, describing her daily activities.  She got up every morning to help the twins who were five then.  She took them to school, washed dishes and clothes, took a nap every afternoon, and returned to pick up the twins.  Cox helped her grandkids with their studies, prepared dinner and did the dishes.  She bathed the boys and was teaching them how to take care of the dog. [AR 200-201.] Cox stated she used to work full time before she had problems, but now she had too many problems.  She was able to take care of her personal needs without help.  She prepared meals but her daughter might help.  Her meals could take up to an hour and a half to prepare.  Cox did not do yard work but could walk, drive a car, and do the shopping.  She paid the bills.  Her hobbies were watching TV and fishing but only occasionally.  She emailed and talked to friends.  She went to church. [AR 204.] Cox reported problems lifting, walking, going up stairs, completing tasks, and concentrating. [AR 205.] She did not handle stress well due to her panic attacks. [AR 206.]

On November 10, 2008, Cox's husband filled out a third-party anxiety questionnaire. He had known Cox for 25 years and witnessed her have hundreds of anxiety attacks that lasted minutes to an hour. Stress and anxiety brought them on. Cox became shaky, short of breath, and dizzy. She felt her heart was pounding and had a "heart attack feeling." She cried when this happened. She was unable to work because she did not know when the attacks might occur. [AR 210.]

Cox was seen by her primary care doctor on November 28, 2008, in relation to her disability paperwork. [AR 606; dup 668.] On November 28, 2008, Dr. Dycus filled out a multiple impairment questionnaire provided to him by Cox's attorneys. The diagnoses were COPD, CAD, the autoimmune problem, angina, and fatigue. Her prognosis was poor to fair. Dr. Dycus noted her triple bypass surgery and COPD. Her primary symptoms were chest pain, fatigue, leg pain. She also suffered from chest pain 2-3 times a week. [AR 596-97.] Medications did not completely relieve her pain. She was able to sit for 3 hours a day and to stand or walk one hour. She could not walk or stand continuously. Dr. Dycus opined that Cox could lift up to 10 pounds occasionally but never 20-25 pounds. There was no significant limitation in her ability to reach, handle, or finger. He listed her medications, including Xanax. [AR 600.] He believed Cox's symptoms would increase if she were in a work setting. Her neck did not trouble her with computer work. The pain was enough to constantly bother her ability to pay attention and concentrate. Dr. Dycus believed her impairments lasted or would last more than 12 months and that she was not a malingerer. She was incapable of even low stress due to depression, anxiety, and needing medication. She would need unscheduled breaks daily for an hour. [AR 601.] She might have good days, occurring more than 3 times a month. She was prone to infections and had psychological limitations. [AR 602.]

On December 2, 2008, Cox saw Dr. Dycus for sinus congestion. [AR 605; dups 667, 736.]

On December 12, 2008, Cox's DIB application was denied at the initial level.  Her primary diagnosis was listed as CAD; and the secondary diagnosis was "essential hypertension."  Disability services reviewed her medical records and concluded that none of her conditions was disabling on any date through the date she was last insured. [AR 58-59.]

On December 12, 2008, a physical RFC assessment was performed.  The evaluator determined that Cox could lift 20 pounds occasionally and 10 pounds frequently.  Cox could sit, stand or walk 6 hours in an 8 hour day.  Her ability to push or pull was unlimited.  She had no postural limitations, no manipulative or visual limitations, and no communicative limitations. [AR 616-619.] She should avoid fumes, odors, dusts, and other allergens.  The evaluator noted that Cox's symptoms were credible given the objective medical findings.  She appeared to be recovering from coronary bypass surgery. [AR 621.] She had heart problems, high blood pressure, anemia, and asthma.  However, Cox was healing well from her surgery in December 2007.  An x-ray from January 2008 was negative.  Her cardio exam indicated she was good or stable, as of April 2008.

On December 12, 2008, a psychiatric review technique assessment was performed.  Bruce Hertz, Ph.D. evaluated Cox's mental conditions.  He found that the impairments were not severe, either under § 12.04 (affective disorders) or § 12.06 (anxiety).  Dr. Hertz concluded there were mild limitations in the restriction of daily activities, social functioning, concentrating, and persistence/pace.  There were no episodes of decompensation.  Dr. Hertz reviewed records indicating heart problems, high blood pressure, anemia, asthma, depression, and panic disorder.  Cox experienced depression and panic attacks due to her heart condition and other medical problems.  Her doctor prescribed Xanax and Prozac after her bypass surgery.  She was not suicidal.  She was able to care for her 5 year told twin grandsons.  Cox performed personal hygiene independently.

19

She did not need reminders.  She could prepare meals.  The overall indication was that while Cox had symptoms of anxiety and depression, they were not severe. [AR 624-36.]

### *2009 Medical and Disability Records*

On January 5, 2009, Cox saw Dr. Dycus for lower back and side pain.  [AR 666; dup 735.] A chest x-ray, taken February 5, 2009, showed a normal heart, that her chest was clear, and no evidence of congestive heart failure. [AR 672; dup 743.] On February 5, 2009, Cox complained of tingling in her arms and legs, memory loss, blurry vision, disorientation when awakening, frequent headaches, fatigue, and lower back pain.  A sleep study was ordered, along with an MRI of the brain and a referral to neurology. [AR 734; dup 665.] The MRI of the brain was unremarkable and indicated a normal brain. [AR 671; dup 742.] The sleep study documented mild supine predominant obstructive sleep apnea; a second test was recommended. [AR 659, 660, 662.]

On February 20, 2009, Cox filed a disability report-appeal.  There were no changes since her last report. [AR 219.] She still could take care of her personal needs but it took longer. [AR 222.] On February 27, 2009, she complained to Dr. Dycus of coughing, eye pain, and nasal pain.

On March 1, 2009, Dr. Dycus addressed a letter to whom it may concern, stating that in the past 2 years, Cox had CAD 3 vessel disease, pulmonary embolism, unstable angina, depression, fibromyalgia, GERD, asthma, and sleep apnea.  She had coronary bypass surgery and took multiple medications.  Dr. Dycus saw her on a monthly basis in addition to her cardiology appointments.  Her prescriptions were Prozac, Nexium, Accolate, Advair, Lipitor, Metoprolol (for angina and high blood pressure), and Xanax.  Dr. Dycus opined that due to medical conditions and side effects of medications, including persistent fatigue, intermittent chest pain, and shortness of breath, Cox was unable to work full time; Dr. Dycus did not expect this to change in the next 12 months. [AR 675.]

On March 9, 2009, Cox filled out a supplemental cardiac questionnaire. She stated she never was hospitalized for a heart attack, but had a heart catheterization in December 2007. She had a blood clot then as well. Cox went to the hospital "a lot" for chest pain subsequent to her triple bypass surgery and had EKGs and monitoring. [AR 237-38.] She tired quickly from stress. She could walk about 1/4 mile before having shortness of breath. She could lift 10 pounds. She used to be able to run and play with the grandkids and travel out of town. She stated she felt bad all the time and reported chest discomfort at least once a week. [AR 237, 240.] The condition was helped by lying down, being calm, and taking medications. It sometimes took 1-3 days for her chest discomfort to subside.

In a function report, filled out March 9, 2009, Cox noted that she got up for her shower, loaded the dishwasher, sat down and rested, watched television, sat with her grandsons for awhile and talked to them about school. She went to bed and watched television for a few hours. [AR 242.] She did not take care of anyone at home. Her grandson helped care for the dog. Cox used to work, clean, and go on long trips but could not do that now. [AR 243.] She was diagnosed with sleep apnea. She awoke at night with chest pain and shortness of breath. Cox still could look after her own personal care although she had to put out her medications to remember them. [AR 244.] She prepared sandwiches, soup, and frozen dinners that took about 15 minutes. She used to cook full course dinners for the family. Her husband or daughter now did the meals, and her daughter helped with chores. She could drive if she felt up to it. Cox stated she used to be very active, work in the hard, ride a bike and play softball. [AR 246.]

On March 13, 2009, Cox's husband filled out a supplemental third-party anxiety questionnaire. He stated Cox started having panic attacks in 1993 and 1994, and that he had observed her having hundreds of them. They lasted from 30 minutes to an hour. Stress or

21

something else caused them.  Cox was scared, shaky, and felt her heart pounding with the attacks.  She felt like she was going to have a heart attack.  She was afraid to leave home knowing she might have a panic attack.  At work, she had the attacks all of the time.  Cox felt better by being at home and taking her medications. [AR 225-26.]

On March 15, 2009, Cox's daughter filled out a third-party function report. [AR 228.]  The daughter's report contains virtually the same information that appeared in Cox's March 9, 2009 report [AR 242.]

On March 28, 2009, Cox complained to Dr. Dycus of left shoulder and back pain.  He prescribed Lortab. [AR 732.]  On April 3, 2009, Dr. Kothari observed that Cox was diagnosed with obstructive sleep apnea and was started on a CPAP. [AR 70.]  On April 20, 2009, Dr. Kothari ran some tests on Cox.  There were no anginal symptoms in response to the exercise test and no EKG evidence of ischemia.  The test indicated normal myocardial perfusion. [AR 713.]

On April 23, 2009, a Physical RFC Assessment was performed.  The primary diagnoses were CAD and asthma.  A secondary diagnosis was hypertension.  Cox had anemia and angina.  She could lift 20 pounds occasionally and 10 pounds frequently.  She could sit, stand, or walk for 6 hours out of an 8 hour day.  There were no limitations as to her ability to push or pull. [AR 678-79.] She was to avoid fumes, odors, dusts, etc.  In reviewing the medical records, Dr. Dawson noted Cox had "nonspecific atypical chest pain with several admits post CABG" for angina.  The last chest pain incident occurred in November 2008.  She received gammaglobulin infusions for several years but had none since 2006.  There were no current findings of anemia.  There were no hospital admissions for asthma in the last 2 years.  Dr. Dawson found Cox's symptoms to be partially credible and attributable to medically determinable impairments that caused some limitation of residual functioning.  But, the severity of the symptoms and alleged effect on functioning were not entirely

consistent with the total medical and nonmedical evidence, including Cox's own statements, others' statements, observations about her activities of daily living, and alterations of Cox's usual behavior or habits. According to Dr. Dawson, the allegations and symptoms appeared disproportionate to the severity and duration expected based on the medically determinable impairments. Accordingly, the RFC should be reduced to reflect remaining work capacity with appropriate restrictions to compensate for impairments and associated symptoms that could be medically determined. [AR 683.]

On April 24, 2009, Cox reported no chest pain to Dr. Kothari. She wanted to start an appetite suppressant. [AR 708.] On this same date, Cox discussed weight loss with Dr. Dycus. [AR 731.] On April 25, 2009, there was an angiogram of her chest based on complaints of shortness of breath. The result showed a nonspecific left adrenal mass that might be an adenoma. There was minuscule pericardial effusion. There was a small left-sided pleural effusion, indicating changes from emphysema. [AR 689.] On April 26, 2009, the transthoracic echo was unremarkable. [AR 710, 711.]

On April 27, 2009, Cox had an MRI of her abdomen for the adrenal mass. A comparison was made to the CT of her chest from April 25 and December 23, 2007. There was a well circumscribed left adrenal mass, stable in size and morphology, as compared to the 2007 test. It did not meet the criteria for an adenoma. It could represent a "lipid poor adenoma" or other etiology. The lack of significant change over a 16-month period favored a nonaggressive approach. [Doc. 691.]

On April 27, 2009, Cox also had an MRI of the lumbar spine. The hypertrophy seen on the left side neural foraminal narrowing was mild. There was no definite central canal narrowing.

There was mild multi-level spondylosis.  The MRI showed disk desiccation with posterior annular tear at certain levels, along with a mild disk bulge. [AR 687-88.]

On May 1, 2009, Cox was seen at her cardiologist's office for shortness of breath.  The record documents a history of hypertension, hypercholesterolemia, no diabetes, "former smoker," and that she presented to the hospital with chest pain, dyspnea (shortness of breath), coughing, fever, and chills.  Cox recently had been to the office and had a negative nuclear stress test one week earlier.  A "CTA" of the chest revealed a nonspecific left adrenal mass, consistent with the appearance of adenoma (non-cancerous tumor).  X-ray results revealed dense opacification of the left lung base, "concerning for pneumonia." [AR 719.] The impression was pneumonia.  There was no evidence of ischemia.

On May 1, 2009, a Psychiatric Review Technique assessment was performed by Theodore Weber, Ph.D.  This assessment was essentially the same as the prior one.  Notes indicated that Prozac and Xanax helped Cox's depressive symptoms and anxiety.  She functioned independently from a mental standpoint.  Any limitations she had were not severe. [AR 693.]  On May 1, 2009, Cox's request for reconsideration was denied.  Disability services indicated Cox could perform the position of medical assistant as it was generally performed. [AR 60, 61.]

On May 13, 2009, Cox returned to AAS for allergy testing and pulmonary function reports. These pulmonary function reports, whether accurate or not, indicate Cox was smoking ("smoking 25") and that she had severe airway obstruction. [AR 759.] On May 13, 2009, a physician with AAS wrote to Dr. Dycus stating Cox missed her follow- up appointments and was having an increased amount of "social issues."  She was hospitalized on April 24, 2009 for a fever, presumed to be pneumonia.  She was using a CPAP that helped with daytime sleepiness.  This letter indicates Cox "is chronic smoker." [AR 785.]

On June 5, 2009, Cox requested a hearing. [AR 17.]

On June 11, 2009, Cox complained to Dr. Dycus of body aches, chills and nausea for 2 days. [AR 730.] On July 1, 2009, she had about the same complaints. [AR 729.] An x-ray on July 1, 2009 showed she was stable without problems. [AR 741.]  On July 20, 2009, she reported to Dr. Dycus problems with chest tightness, difficulty breathing, coughing, fever, congestion, wheezing, and phlegm. [AR 728.] On July 22, 2009, Dr. Dycus saw Cox again for similar problems. [AR 72.]  A pulmonary report, dated July 28, 2009, indicated "smoking 25" and severe airway obstruction. [AR 758.]

On July 28, 2009, a chest x-ray indicated the possibility of pneumonia.  The impression was COPD.  There was "severe subtle left pulmonary infiltrates." [AR 771.] On July 28, 2009, Cox saw AAS.  She was hoarse with a cough. [AR 784.]  On August 12, 2009, she again saw AAS.  She felt she either had infections bronchitis or pneumonia.  She was given oxygen therapy in the office and nebulizer treatments.  She felt better.  She lost 8 pounds while sick but regained 2 pounds.  She still had mucous and was hoarse with a mild cough ("smokers cough").  AAS assessed Cox with asthma, COPD, chronic rhinitis stable, pneumonia/bronchitis. [AR 783.]

On August 19, 2009, Cox reported left arm and shoulder pain to Dr. Dycus.  She had numbness in her fingers over 2 weeks. [AR 726.] The August 23, 2009 record is similar. [AR 725.] On August 24, 2009, Cox had a cervical MRI for neck pain, cervical radiculopathy, and ulnar neuropathy.  There was no disk herniation.  The results indicated minimal bulges that were "very mild" and annular bulges.  Otherwise, the MRI of the cervical spine was unremarkable.  There was no disk herniation, cord compression, or root impingement at any level. [AR 739; dups 875, 878.]

On August 31, 2009, Cox reported a right elbow laceration and left knee pain. [AR 723, 724.] On September 28, 2009, Cox saw Dr. Dycus for ongoing hip pain that was sudden in onset.

The only relief was by lying on her back.  Leg elevation also helped.  Motrin took off the "edge."
The doctor checked off "ETOH" and smoking on this form. [AR 722.]  On October 10, 2009, an
AAS record notes that Cox is a smoker. [AR 751.]

On November 10, 2009, it appears that Cox began physical therapy with Jewett Cervical.
The rehab potential was noted as fair. [AR 881.] There appears to be only one physical therapy
record after this date. [AR 874.]

On November 11, 2009, Cox was seen at AAS for a pulmonary function test.  She suffered
from headaches, nausea, body aches, and drainage. [AR 757, 782.] The chest x-ray, dated November
11, 2009, indicated that her clear were lungs and a stable appearance of the chest.  There was no
evidence of congestive heart failure. [AR 769.]  On November 12, 2009, Cox saw Dr. Dycus to
discuss medications. [AR 861; dup 872.]

On November 25, 2009, Cox again saw AAS for a pulmonary function report. [AR 756.]
AAS wrote a letter to Dr. Dycus indicating Cox had no problems that day and was normal. [AR
781.] On December 30, 2009, Cox complained of a hoarse, sore throat to Dr. Dycus. [AR 860; dup
871.]

### *2010 Medical and Disability Reports*

In 2010, Cox saw doctors or specialists monthly or more frequently.  An AAS record, dated
January 29, 2010, indicates no smoking but severe airway obstruction. [AR 755.] Cox complained
of a cough and tickle in her throat that day. [AR 780.] On February 9, 2010, Cox told AAS providers
that the cough was gone. [AR 779.] She had labwork done. [AR 752.]

On February 11, 2010, Cox saw Dr. Dycus to refill a medication.  The record is not entirely
legible. [AR 859; dup 870.] On February 17, 2010, Cox saw AAS.  The record indicates she is a
smoker. [AR 750.] On this same date, she complained of sinus pressure, a runny nose, and

headaches.  The assessment was COPD, hypogammaglobulinemia, acute "URI."  If she was not better in 3 days Cox was to begin an antibiotic. [AR 778.]

On March 22, 2010, a CT for an infection or swelling around the left periorbital area was negative. [AR 746.] On March 23, 2010, AAS reported Cox had been to the ER and was put on some medication.  She also was taking Percocet.  She had swelling in the left eye and a problem with her sinuses. [AR 777.]

It is important to note again, for purposes of understanding the key time period at issue in this case, that the date Cox was last insured was March 31, 2010.  Thus, while she subsequently had a number of serious health problems, she must demonstrate that she experienced a disabling impairment as of or before March 31, 2010.  *See* 42 U.S.C. §§ 416(i)(3), 423(a), (c) (individual loses eligibility for benefits when she stops paying into Social Security system as of a certain date).  *See also* Henrie v. U.S. Dep't of Health & Human Servs., 13 F.3d 359, 360 (10th Cir. 1993) (because claimant's insured status expired on a specific date, she must prove she was totally disabled prior to that date).

On April 24, 2010, Cox saw Dr. Dycus for ankle pain.  A motorcycle fell on her ankle that afternoon. [AR 858; dup 869.] On May 10, 2010, Cox saw Dr. Dycus for the same complaint. [AR 857; dup 868.]  On June 1, 2010, Cox saw Dr. Dycus for ankle pain and swelling and an ulcer of the right leg.  She complained of anxiety.  She was prescribed Lortab and Xanax. [AR 856; dup 867.]

On June 10, 2010, Cox saw Dr. Kothari for chest pain and indigestion. [AR 803.] She had a stress test for angina and CAD on June 14, 2010.  There were no anginal symptoms but there was EKG evidence of ischemia.  The nuclear study revealed evidence of ischemia; thus, a cardiac catheterization was recommended. [AR 809.]

Cox saw Dr. Bajaj on June 16, 2010 and discussed the June 15, 2010 echocardiogram that showed normal global "LV systolic function" and "borderline mitral valve prolapse with minimal mitral regurgitation." [AR 800.]

On June 24, 2010, Dr. Torres-Aguiar performed a left heart catheterization. One of the resulting diagnoses was "peripheral vascular disease with chronic 100% occlusion of the anterior tibial artery" in the left leg. [AR 806.] He recommended initial medical, aggressive therapy with modifications of all risk factors. If there was recurrence of chest pain, Dr. Torres-Aguiar suggested that a "percutaneous revascularization of the native obtuse marginal vessel" should be "strongly considered." [Id.]

There is a June 24, 2010 record indicating that Cox was at Dr. Bajaj's office for cardiac catheterization "status post seizure." [AR 899.] Cox was found to have acute mental status changes, was not responding, and had disturbed speech. She was not alert or oriented. She was transferred to Florida Hospital for neurological consultation and monitoring. Her chest x-ray was normal. The MRI of the brain indicated acute/subacute ischemic infarcts, left-sided. The record indicates Cox smoked 1 ½ packs of cigarettes a day and was a chronic smoker as of this date. [AR 900.]

Apparently, based on the evidence of ischemic infarcts, Cox alleges she suffered 4 strokes at this time. Her counsel stated she suffered "multiple strokes during or immediately after the catheterization procedure, as indicated by an MRI of her brain on June 25, 2010." [Doc. 24, at 8] (*citing* AR 789-91). According to Cox, the strokes caused her to develop a disorder called aphasia characterized by impaired language functioning, requiring speech therapy. [Id.]

On June 24, 2010, Cox signed a discharge note advising what happened if one quit smoking, *e.g.,* the risk of heart attack and stroke drops as soon as one quit; after 1 year of not smoking, the risk of heart attack falls by 50%; the risk of stroke drops to the level of someone who does not smoke.

28

[AR 887.] It is not clear if Cox read this portion of the discharge papers even though she signed it. It appears that she was prescribed nicotine patches to use on June 27, 2010. [AR 891.] She was also given a document stating that smoking was the greatest single danger to the health of "your arteries." It placed a person at a higher risk of PAD. [AR 896.] It put a person at risk for stroke and heart attack. The note indicates that smoking was discussed in detail and that Cox signed this form saying she knew information was available upon request for "stop smoking programs." [AR 897.]

On June 25, 2010, Dr. Villar at the hospital noted Cox's history of hyperlipidemia, hypertension, obstructive sleep apnea, CAD, and tobacco abuse. She underwent heart catheterization the day before and that she stated she felt "different" following the procedure. She was reportedly confused and aphasic then. Cox still had trouble with speech. She denied headaches, vision changes, numbness, or tingling. Tobacco abuse again was noted and the record states she continues to smoke daily. A 14-point review of systems was negative. Her comprehension was fine and her speech was fluent. She had occasional problems with expressive aphasia. The assessment was "stroke - embolic in nature, possibly secondary to heart catheterization." [AR 789-790.]

Cox saw Dr. Dycus for a follow up on June 28, 2010. [AR 855; dup 866.] On June 30, 2010, Cox returned to Jewett Orthopaedic for continued evaluation and management of her right lower leg pain. [AR 874.] On July 4, 2010, Cox was admitted to the hospital for lower extremity cellulitis. She did well on antibiotics and was discharged after two days. [AR 908.] She had a recent history of a cerebralvascular accident ("CVA") also known as a stroke. [AR 917.] On July 16, 2010, Cox saw Dr. Kothari. She still had a mild speech deficit and minor aphasia. [AR 797.]

On July 21, 2010, she was seen at Neurology and Movement Disorders. She continued to have problems with her speech. The MRA of her brain was negative. She was starting speech therapy. [AR 792.]

29

On August 20, 2010, Cox saw Dr. Kothari.  There was significant improvement in her speech with improved comprehension and less slurring.  Cox's current medications were: Accolate, Advair, Aspirin, Flexeril, Metoprolol, Mucinex, Nexium, Nitro, Plavix, Prozac, Vivaglobin, Vytorin (lowers bad cholesterol), Xanax, and Xopenex (used to treat asthma).  Cox's peripheral vascular disease was being managed by medication.  That was similarly true for carotid atherosclerosis, mild bilateral disease.  With respect to hypercholesterolemia, Cox could not afford some of the medications.  She was to continue taking Plavix. [AR 794-95.]

On August 20, 2010, Dr. Kothari filled out a Cardiac Impairment Questionnaire, stating Cox began seeing him in November 2007.  Her prognosis was fair.  She suffered from chest pain, anginal equivalent pain, palpitations, and sweatiness.  Dr. Kothari reviewed the procedure from December 2007. [AR 840.] Cox suffered from frequent chest pain that was brought on by emotional stress and physical exertion.  He opined that Cox could sit for 1 hour and stand or walk for 1 hour.  She could occasionally lift 10 to 20 pounds.  She had good and bad days.  She was not a malingerer.  Cox's symptoms of pain and fatigue would frequently interfere with her ability to pay attention and concentrate. [AR 843.] She was incapable of even low stress.  She had residual CAD that needed angioplasty.  There was a lot she could not do. [AR 844; dup 846-851.]

On August 20, 2010, Cox complained of a big toe problem to Dr. Dycus. [AR 854; dup 865.] On August 21, 2010, Cox discussed paperwork with Dr. Dycus. [AR 853; dup 864.]  On August 21, 2010, Dr. Dycus filled out a Multiple Impairment Questionnaire, stating Cox's prognosis was poor. She had poor balance and ataxia. [AR 814.] Cox suffered from angina and persistent pain. [AR 815, 816.] She was fatigued, and medications did not resolve all of her problems.  She could sit 3 hours and could stand for up to an hour.  She could not sit continuously in a work setting. [AR 816.] She must get up every 15-30 minutes.  She was moderately limited in using her arms and hands.  The

symptoms Cox suffered would increase if she was working. [AR 817.] She was in constant pain and was emotionally labile. She was not a malingerer. She could not handle low stress and cried easily. [AR 818.] Cox could lift 5 to 10 pounds occasionally. She only had bad days now. [AR 820.] She was prone to infections. [AR 820; dup 831.]

On September 10, 2010, Dr. Pragnesh Patel, with AAS, filled out a Pulmonary Impairment Questionnaire, in which he diagnosed Cox with COPD and hypogammaglobulinemia. Dr. Patel noted these were lifelong, chronic diseases. [AR 823-29.] Dr. Patel first saw Cox in August 2000. Her symptoms were shortness of breath, chest tightness, wheezing, acute bronchitis, fatigue, and coughing. [AR 824.] Depression and anxiety affected her problems. She used a nebulizer every 4-6 hours as needed and daily inhalers. [AR 825.] Cox had frequent chest symptoms, on a daily basis. Fatigue frequently interfered with her ability to pay attention and concentrate. She needed a break every hour or two. Her symptoms would last 12 months. She still could have some good days. She would be absent more than 3 times per month if working. [AR 823-28.]

On October 1, 2010, Cox appeared at the ALJ hearing with a non-attorney representative. [AR 27-58.] Cox testified that while she was a long-time smoker, she had not smoked since her heart procedure in December 2007. Based on the records, this clearly is inaccurate although it may be that Cox stopped smoking in 2010, at least for some period of time. It simply is not clear from the records.[22]

_____

[22]The Court finds it of great concern that Cox apparently continued and still may continue to smoke, even after heart surgeries and procedures, and after being warned about the risks on numerous occasions. There is no question that Cox's many heart and respiratory conditions and problems cannot be helped by smoking and indeed, can only be worsened by smoking. The Court does not minimize the addictive nature of smoking, but it encourages Cox to heed her doctors' advice.

At the hearing, Cox also testified that she had 4 strokes during the catheterization. [AR 35.] As discussed above, it is not clear from the record how many strokes she had nor how severe they were in effect.  Cox stated she had severe shortness of breath and used both maintenance inhalers and a rescue inhaler that was effective "to some degree." [AR 36.] She suffered 5-10 attacks a week that lasted 20-30 minutes.  She was fatigued all of the time. [AR 37.] She mostly had pulmonary infections as a result of her weakened immune system but she also had cellulitis. [AR 37.] Cox took Vivaglobin weekly and had a four-hour injection once a week. [AR 38.] The record does not demonstrate weekly four-hour injections, but not all of the records are legible.  She complained of swelling and muscle aches for 2-3 days.  She took Xanax for psychological impairments.  She started having panic attacks 15 years ago when her son committed suicide. [AR 38-39.] Between December 2007 and March 2010, she had daily, multiple panic attacks. [AR 39.] She had depression that started at the same time, and her depression was made worse by the panic attacks. [AR 40.]

Cox testified that she cooked and was teaching her grandson how to cook and clean.  She also did the laundry.  She could sit every 20 minutes but had bursitis in her left hip.  Her hip throbbed and she had to stand 15-20 minutes.  After standing for 10 minutes, her left leg hurt for some reason. [AR 42.] She had a 100% blockage in her artery. [AR 42.] She was unable to lift any weight at all but possibly could carry 5 pounds.  Typically, Cox was up at 5:30 a.m. with the boys, got them dressed, and fed them. [AR 43.] She then sat down, drank coffee, and watched TV.  She took a nap for her fatigue, immune disorder and the blockage.  She slept for 3 hours maybe. [AR 45.] Her husband worked.  The grandchildren returned home in the afternoon and she gave them a snack.  She helped with their homework.  Her husband cooked a lot.  Cox liked to read and she loved to fish, but could not breathe outside if it was too humid. [AR 47.] The CPAP helped her sleep apnea, but she had headaches and fatigue.

32

Cox discussed her work history at the hearing. She felt that the stroke affected her memory. She took Xanax before coming to the hearing so she would not have a panic attack. [AR 50-51.] She smoked from the age of 17 until 2007. [AR 51.] When the ALJ noted that recent records from the hospital, as late as June 2010, indicated she still smoked every day, she disagreed and said she quit. [AR 51.]

The ALJ asked the vocational expert questions and developed a hypothetical question. Based on the hypothetical and restrictions, the VE testified that Cox could perform the job of receptionist in a doctor's office because it was sedentary and was a semi-skilled position. That position was the only job she could perform, if she was unable to do highly detailed and highly complex tasks. She could not miss 2 or more days per month and retain the job. If she was unable to sit more than 30 minutes at a time and had to get up to perform tasks for 15 minutes before she resumed sitting, the VE stated she still could perform the receptionist position. [AR 56.] She could not take breaks for fatigue.

A pulmonary function report, dated October 10, 2010, may indicate Cox was still smoking. [AR 760.] On October 26, 2010, the ALJ issued the adverse decision denying benefits. [AR 17-25.]

On November 8, 2010, Cox was seen at a hospital in Hobbs, New Mexico for sinus and breathing problems. She was discharged the same day. She denied tobacco abuse on this date. [AR 926, 927.] On December 20, 2010, she reported having an anxiety attack. She stated that her son-in-law stole her Xanax and that her primary care doctor was out of town. She had taken Xanax for 15 years for severe anxiety. [AR 923.]

There are no records in 2011. The only other records are Cox's attorney's letter, dated April 10, 2012, to the Appeals Council [AR 277] and the Appeals Council's denial of the request for review. [AR 1-4.]

33

## VI.   **DISCUSSION**

A.   Alleged Legal Errors

Cox sets forth three primary challenges.  She argues that: (1) the ALJ erred in rejecting the functional capacity assessments of treating physicians Dycus, Kothari, and Patel; (2) the ALJ erred in finding that the only functional limitation stemming from Cox's anxiety is a restriction to moderately complex tasks; and (3) that substantial evidence did not support the ALJ's finding that Cox's subjective complaints were not credible. [Doc. 24, at 1.]

B.   Treating Physicians' Opinions

Cox argues that the ALJ failed to give controlling weight to her treating physicians' opinions about the nature and severity of her impairments, especially here, where her symptoms, prognosis, and restrictions were well supported by clinical and laboratory diagnostic testing and were not inconsistent with other substantial evidence of record. [Doc. 24, at 12.]

The Commissioner argues that all three treating doctors' questionnaires or opinions were dated after Cox's insured status expired.[23] [Doc. 25, at 5.] In addition, the Commissioner asserts that the ALJ did not reject the doctors' opinions in their entirety.  Instead, the ALJ adopted portions of the opinions that were supported by medically accepted clinical and laboratory diagnostic techniques.  [Id.]

The Court agrees with the standards set forth in assessing treating physicians' opinions.  For example, a treating doctor's opinion is not entitled to substantial weight if it is not supported by medically acceptable clinical and laboratory diagnostic techniques.  Hamlin v. Barnhart, 365 F.3d 1208, 1215 (10th Cir. 2004); Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).

---

[23]While true, it does not appear that the ALJ relied on this position in discounting the treating physician's opinions as to Cox's limitations.

In addition, if the ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must decide "whether the opinion should be rejected altogether or assigned some lesser weight ." Pisciotta v. Astrue, 500 F.3d 1074, 1077 (10th Cir. 2007). Treating source medical opinions not entitled to controlling weight "are still entitled to deference" and must be evaluated in light of the factors in the relevant regulations, 20 C.F.R. §§ 404.1527 and 416.927. Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003).

In her decision, the ALJ discussed Dr. Kothari's opinions set out in the cardiac impairment questionnaire. [AR 22.] She noted Dr. Kothari's diagnoses and opinions, stating that Dr. Kothari opined Cox "could sit for eight hours in an eight-hour workday, but could stand and walk for less than 1 hour a day in a competitive five-day workweek." [Id.] The ALJ then noted Dr. Kothari's lifting restrictions for Cox.  The ALJ incorrectly set out Dr. Kothari's opinions with respect to how many hours she could sit each day.  In the questionnaire, Dr. Kothari found that Cox could sit for only 1 hour, rather than 8 hours, in an 8 hour workday. [AR 842.] Most likely, this was a typographical error by the ALJ, but it is not absolutely clear.

The ALJ also discussed Dr. Dycus's opinions with respect to Cox's cardiovascular impairments.  According to the ALJ, Dr. Dycus estimated that Cox could sit for 3 hours and stand and walk for less than 1 hour. [AR 22.] The ALJ noted Dr. Patel's completion of a pulmonary impairment questionnaire as well.  She stated that Dr. Patel indicated Cox had no sit, stand or walk limitations and no lifting or carrying limitations.  Dr. Patel did not actually conclude on the form [AR 826] that Cox had no restrictions as to her ability to sit, stand or walk.  Nor did he find that she had no limitations regarding her ability to lift and carry certain weights.  Instead, he did not complete this portion of the form and marked some of the areas "N/A" (with respect to lifting and

35

carrying weight).  Dr. Patel did opine that Cox would need unscheduled breaks every hour or two in a workday.

The ALJ discussed the weight she assigned to the medical providers' opinions and findings and those of the state agency medical consultants.  For example, the ALJ concluded that the state agency medical consultants, while not having examined Cox, provided specific reasons for their opinions about her RFC.  The ALJ determined that their opinions were based on the objective evidence in the case. [AR 24.]

The ALJ gave "weight to the lift and carry assessments of Drs. Kothari and Dycus because they document the claimant's residual functional abilities in light of her cardiovascular impairments." [AR 24.] Moreover, the ALJ found that their functional assessments as to what amount of weight Cox could lift or carry "was consistent with the overall normal findings of the claimant's diagnostic test and studies." [Id.] The ALJ, however, assigned "little weight" to the treating physicians' opinions as to how long Cox could sit, stand or walk "because they failed to provide medical documentation or physical examination results supporting the assessed limitations." [Id.]

The ALJ concluded that the RFC, including Cox's ability to sit, stand and walk for 6 hours a day in an 8-hour workday [AR 20], was supported by the medical records of Drs. Kothari, Dycus and Patel, along with results from tests and studies, the assessments of state agency medical consultants and the ALJ's observations of Cox at the hearing. [AR 24-25.] The ALJ did not further discuss her decision to discount the treating physicians' opinions.

The Court observes first that the ALJ's recitation or interpretation of some of the treating physicians' opinions as to how long Cox could sit, stand or walk during a workday either was inaccurate or mistaken.  In addition, it is not clear what tests or studies actually demonstrate, during

the pertinent time frame, the amount of time Cox might be able to sit, stand and walk during a typical workday.  While the state agency physicians' opinions regarding how long Cox could sit, stand or walk during a workday are consistent with the ALJ's conclusion, those physicians never examined Cox.  The Court recognizes that state agency physicians are highly qualified medical experts.  Nonetheless, opinions of a treating physician are generally given more weight than those of an examining consultant; the opinions of a non-examining consultant, such as the case here, are given the least weight.  *See* Tietjen v. Colvin, --- Fed.Appx. ----, 2013 WL 2436638, at *1 (10th Cir. June 6, 2013) (unpublished) (citation omitted).  Here, the state agency non-examining physicians' opinions are contradicted by two of three treating physicians' opinions.  It is noteworthy that none of the treating doctors found Cox was a malingerer.

Moreover, the treating physicians saw Cox on multiple occasions through a period of years, documenting her many conditions, diagnoses, tests, and treatments.  For example, from the onset date to the date of last insured, Cox's primary care doctor saw her approximately 40 times.  Cox's cardiologists or physicians in that practice saw her about 13 times.  AAS physicians saw Cox over 15 times.  She was seen at the hospital or ER about 9 times.

During the same time period, Cox had a number of procedures and tests performed, including triple bypass surgery, several cardiac catheterizations, echocardiograms, stress tests, MRIs of the brain, abdomen, cervical and lumbar spine, EKGs, sleep studies, and a CT.  She had multiple x-rays and pulmonary conduction studies, along with lab work and allergy testing.  She had diagnoses of serious heart disease and CAD, a pulmonary embolism, one or more strokes, COPD, asthma, chronic rhinitis, common variable immune deficiency, repeated upper respiratory infections and bronchitis, hypertension, moderate to severe airway obstruction, dyslipidemia, shortness of breath, panic attacks, depression, obstructive sleep apnea and adenoma.  *See, e.g.,* [AR 372, 417, 476, 494, 507,

528, 539, 550, 578, 579, 580, 584, 585, 586, 587, 588, 592, 659, 710.][24] Stated differently, this is not a case where Cox's three treating physicians lacked an opportunity to evaluate Cox's many conditions and further determine, as they all did, that she was not a malingerer.

In addition, on March 1, 2009, Dr. Dycus wrote a letter discussing Cox's "unstable angina," and other conditions. He opined then that due to her medical conditions and side effects of medications, persistent fatigue and intermittent chest pain and shortness of breath, she was unable to return to full time work in the last 2 years and did not expect this to change in the next 12 months. [AR 675.] In April 2009, Cox presented with complaints of shortness of breath to Dr. Kothari. A July 28, 2009 record and x-ray note an impression of COPD with "severe subtle left pulmonary infiltrates." [AR 771.] An August 2009 record indicates Cox had an exacerbation of a respiratory condition. She was given oxygen therapy in the office. Other records in 2009, however, indicate Cox was doing better at times; in fact, one November 2009 record shows Cox had no complaints on that date but that record was the exception. [AR 781.]

The Court concludes that the ALJ committed error in interpreting restrictions or lack thereof imposed by Dr. Kothari and Dr. Patel. While the errors may have been ministerial in nature, they make it more difficult to review this record. Moreover, the Court is not convinced, based on the record evidence that the ALJ provided sufficiently "good reasons" for rejecting the treating physicians' opinions as to some of Cox's limitations or that substantial evidence supported the ALJ's assignment of weight to the doctors' opinions. *See, e.g.,* Robinson v. Barnhart, 366 F.3d 1078, 1082 (10th Cir. 2004) (ALJ must give good reasons for the weight she assigns to a treating physician's opinion so that a subsequent reviewer can analyze the appropriateness of the weight

---

[24]These are just a few of the records documenting Cox's many medical visits, procedures, tests and diagnoses.

afforded an opinion).  The Court concludes that, under the circumstances of this case, the ALJ did not provide a sufficient reason for rejecting all three treating physicians' opinions as to Cox's limitations.  In addition, the Court finds that substantial evidence does not support the ALJ's decision in relation to the weight assigned the treating physicians' opinions as to how long Cox was able to sit, stand or walk during the pertinent time frame.

## VII.   CONCLUSION

For these reasons, the Court grants the motion to remand, and remands this case for additional administrative proceedings.[25]  On remand, the ALJ may elect to order a consultative examination of Cox since there appears to have been none in this case.  In addition, should the ALJ once again determine that Cox is able to perform past relevant work, the judge should make specific findings as to the physical and mental demands of Cox's past relevant work.  *See, e.g.,* Sissom v. Colvin, 2013 WL 765302, *5 (10th Cir. Mar. 1, 2013) (unpublished) ("ALJ must make findings regarding the physical and mental demands of the claimant's past relevant work[;]" in so doing, the "ALJ must obtain adequate factual information about those work demands which have a bearing on the medically established limitations.") (citations omitted).

IT IS THEREFORE ORDERED that Cox's motion to remand [Doc. 24] is GRANTED, with the result that this matter is remanded for additional administrative hearings, consistent with this opinion.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge

---

[25]The Court briefly observes that it did not find persuasive Cox's additional arguments for remand, *i.e.,* the ALJ's credibility findings or functional limitations stemming from Cox's anxiety. However, the Court does not specifically analyze those arguments based on its decision to remand on other grounds raised by Cox.